**JUDGE CRONAN**

26 CV 03820

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2026 MAY -8  AM 10: 42

MOYA MORGAN,

                                        Plaintiff,

            -against-                              Civil Action No. _____

JPMORGAN CHASE BANK, N.A.,

                                        Defendant.

COMPLAINT AND JURY DEMAND

Plaintiff Moya Morgan ("Plaintiff"), proceeding pro se, respectfully alleges as follows, based upon personal knowledge as to herself and upon information and belief as to all other matters:

I. INTRODUCTION

1.  This action arises from notifications Plaintiff received at approximately 3:00 a.m. on June 7, 2024, alerting her that her personal banking accounts had been suddenly restricted and were being shut down. On June 8, 2024, a Claims Department manager informed Plaintiff that her account had been restricted because customer service had submitted eleven claim forms associated with her account. Plaintiff had initiated two disputes—one relating to Amazon Prime and one for Google Family Locator— representing two occurrences, in May 2024. Defendant's internal records associated with these entries included the notation "DO NOT READ THE FOLLOWING TO THE CUSTOMER." Its internal criteria reflected a threshold of ten claims within a rolling year; however, eleven claim entries were generated within a single month from only two underlying disputes. Defendant applied an undisclosed and inconsistently

1

enforced standard that was neither disclosed to Plaintiff nor tied to any identified policy violation to terminate her for alleged "fraud in personal accounts for financial gain."

2.    Defendant acted in a dual capacity: (a) as a financial institution handling Plaintiff's personal account activity; and (b) as Plaintiff's employer. Following the two disputes Plaintiff initiated in May 2024, Defendant's exhibits reflect that Plaintiff's account was placed under review. At that time, Defendant had access to Plaintiff's personal consumer-banking data, including her transaction history, spending patterns, location data, the duration of her banking relationship, purchases from culturally specific vendors, and data reflecting that Plaintiff was over the age of 40 and from which her race was known or readily ascertainable. On June 8, 2024, Plaintiff challenged the number of claim entries and the risk designation associated with customer service submitting eleven claim forms in rapid succession in her account. On June 10, 2024, once Plaintiff was identified as both a customer and an employee, Defendant intervened in the ongoing review and escalated her personal banking activity into an internal ethics reporting channel, where she was immediately labeled a "Suspect."

3.    After Plaintiff was identified as an employee who challenged the number of claim forms submitted by customer service in rapid succession, Defendant reported Plaintiff through its internal ethics reporting process. It then applied a "potential loss to the company" of $296.19 to drive escalation to centralized review. Defendant later reported "zero loss to company" and closed Plaintiff's account using the designation "Closed – does not convey a negative situation," reflecting no confirmed finding of fraud at the consumer-banking level. Notwithstanding these findings, Defendant concluded that Plaintiff abused the claims process and engaged in "fraud for her financial gain."

2

4. Defendant used internally generated and unreconciled data, applied shifting and undefined standards, and did not tie its conclusions to any identified transaction or specific conduct.

5. Defendant then used those unsupported conclusions to justify termination, causing economic, reputational, and emotional harm to Plaintiff.

6. At the time of termination, Plaintiff was the oldest and only remaining person of colour on her team. Defendant did not identify any specific fraudulent transaction, nor did it establish any intent to defraud or resulting financial loss. These omissions undermine the credibility of its stated reasons and support an inference of pretext.

II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 ("ADEA").

8. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district, and Defendant conducts business here.

III. PARTIES

10. Plaintiff Moya Morgan is an individual residing in New York and a military veteran of the United States Armed Forces, having honorably served.

11. Defendant JPMorgan Chase Bank, N.A. is a national banking association with a place of business in New York, conducts substantial business in New York, and employed Plaintiff in this district.

IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

3

12. On or about May 4, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race and age discrimination.

13. On February 9, 2026, Plaintiff received a Notice of Right to Sue from the EEOC.

14. This action is timely filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

15. A copy of the Notice of Right to Sue is attached as Exhibit A.

V.    FACTUAL ALLEGATIONS

A. Plaintiff's Employment and Protected Characteristics

16. Defendant employed Plaintiff from approximately 2000–2006 and July 25, 2022 through July 9, 2024.

17. Plaintiff performed her duties satisfactorily and received positive performance evaluations.

18. Plaintiff is a member of protected classes based on her race and her age, being over 40 years old.

19. At the time of her termination, Plaintiff was the oldest employee and the only remaining person of color on her team.

B. The Dual-Capacity Relationship

20. Plaintiff maintained a personal consumer banking account with Defendant during her employment, which she opened on January 13, 2000, and maintained for nearly two and a half decades.

21. Defendant acted in dual capacity: (a) as Plaintiff's employer; and (b) as her consumer bank.

22. Defendant used information derived from Plaintiff's personal consumer banking activity—including non-public personal information ("NPPI")—generated in its

4

capacity as her bank to make adverse employment decisions in its capacity as her employer, without clearly defined or consistently applied standards governing such use.

C. Defendant's Internal Claims Processing Systems and Inflated Claim Data

23. Plaintiff initiated a limited number of dispute claims regarding transactions within her personal account.

24. Defendant's claims-handling processes permit the same dispute to be recorded differently depending on how it was routed through the intake channels. Claims team records reflected a more consolidated submission, while customer service entries generated multiple claim forms per dispute. This process inflated the number of claims attributed to Plaintiff, resulting in a claims overload.

25. In May 2024, Defendant's internal records reflected that customer service entered and submitted a total of eleven claim forms for Amazon Prime and Google Family Locator, despite Plaintiff initiating only two disputes. These rapid, back-to-back entries created the appearance of excessive activity and contributed to an alert within Defendant's Exception Management System ("EMS").

26. After Plaintiff was identified as an employee who challenged the number of claim forms submitted by customer service in rapid succession, Defendant relied on inflated and duplicative data to evaluate Plaintiff's account activity and terminate her for alleged "fraud in personal accounts for financial gain."

27. Customer-facing records differed materially from Defendant's internal claims data. Defendant failed to reconcile these discrepancies or distinguish duplicate entries from distinct transactions.

28. These differences affected how Plaintiff's claim activity was aggregated and presented in internal reports used to evaluate her account.

5

D.  Shifting Explanations and Absence of Identified Conduct

29.  Defendant initially treated Plaintiff's conduct as a claims-related issue.

30.  Defendant later shifted its position by: (a) identifying alleged "indicia of fraud" and labeling Plaintiff as high risk; (b) escalating the matter through an internal ethics channel and designating Plaintiff as a "Suspect"; (c) closing the account as "Closed – does not convey a negative situation"; (d) terminating Plaintiff for an alleged Code of Conduct violation without identifying the underlying conduct; and (e) later asserting "fraud in personal accounts" in connection with a denial of unemployment benefits dated August 23, 2024.

31.  Defendant did not identify any specific fraudulent transaction, intent to defraud, or financial gain.

32.  Defendant did not identify any specific Code of Conduct provision allegedly violated.

33.  Defendant's investigation did not tie its conclusions to identifiable conduct by Plaintiff.

34.  Defendant's explanations for its decision shifted over time, and it did not identify any specific conduct by Plaintiff constituting fraud, misuse of the claims process, or violation of any Code of Conduct provision. This pattern reflects the application of undefined and inconsistently applied standards.

E. The Flawed Investigation

35.  On June 28, 2024, the investigation began as a telephone inquiry concerning a NY & Co. claim approximately one year earlier. It then expanded into a workplace investigation without a defined scope, governing standards, or reference to any applicable policy.

36.  Defendant's records reflect that Plaintiff was given a deadline of July 5, 2024, to provide documentation, yet she was instructed to "send what you got" right away

without guidance as to the materials required. In light of the age of the transactions, which dated back to 2023, Plaintiff requested approximately one business day to respond.

37. Defendant did not provide a secure method for transmitting non-public personal information. Plaintiff experienced difficulties transmitting documentation due to firewall restrictions and notified the investigator. The investigator instructed Plaintiff to email the documents to herself and then forward them as an alternative to a secure method of transmission.

38. Because Defendant did not provide a proper method for transmitting documentation, not all of Plaintiff's documents were received. Plaintiff was therefore evaluated as non-responsive and deemed "unable to provide supporting documentation," which Defendant later reported to the New York State Department of Labor ("NYS DOL").

39. Defendant asserts that it spoke with Plaintiff, her manager, and others. However, its records show that the investigator sought "context" from Plaintiff's manager regarding personal issues Plaintiff might be facing, but did not seek Plaintiff's clarification on those matters. The records further show that Defendant used managerial input and generalized conclusions rather than documented, transaction-specific evidence, and escalated the matter as fraud-related without identifying any specific fraudulent conduct.

F. The Termination Decision

40. Defendant initiated an employment investigation based on Plaintiff's personal account activity.

41. Plaintiff was terminated on July 9, 2024. At the time of termination, Plaintiff was informed that she had violated Defendant's Code of Conduct; however, Defendant did not identify any specific provision she allegedly violated or any underlying conduct

7

constituting a violation. Plaintiff was not provided a termination letter at the time. Plaintiff was instructed to gather her belongings, surrender her identification, and was escorted from the premises. Written confirmation of the termination, dated July 11, 2024, was subsequently mailed to Plaintiff.

42. Defendant's explanations for termination shifted over time. Defendant initially asserted that Plaintiff violated its Code of Conduct but did not identify any specific provision or underlying conduct. Defendant later described Plaintiff's conduct as fraud-related, while its internal records reflect a "general misconduct" classification rather than a substantiated finding of fraud. In its position statement, Defendant asserted that it "followed its business-as-usual procedure" and that its internal system flagged Plaintiff's accounts for alleged "claims abuse," citing purported "red flags," including: (a) "ten or more laims within one year," asserting that Plaintiff "filed at least nineteen Claims"; (b) "six or more Claims denied within one year"; and (c) "fraud Claims on three or more cards in nine months," and further describing Plaintiff as an "aggressive Claims filer since 2017." Defendant's exhibits, however, reflect that Plaintiff's accounts were flagged based on the two disputes Plaintiff initiated in May 2024, notwithstanding Defendant's subsequent assertions that Plaintiff had filed at least nineteen claims. Following Plaintiff's termination, Defendant further asserted that Plaintiff's conduct violated a vendor's non-refund policy, introducing a new rationale and substituting a merchant-specific standard for transaction-level analysis under established consumer dispute frameworks.

43. Defendant's claim-count analysis was not based on a fixed or reliable measure of Plaintiff's conduct. Plaintiff initiated two disputes; however, Defendant's customer service representatives inputted multiple entries for the same underlying dispute, resulting in a materially higher number of claim entries. Defendant's customer service

provided conflicting explanations of how claims are accounted for, stating that: (a) the system consolidates multiple entries into a single claim downstream; (b) an authorizing agent may ultimately treat those entries as one claim for purposes of review; and (c) creating multiple claim forms can facilitate internal reconciliation processes. These varying methods of entry, consolidation, and counting demonstrate that the number of claims attributed to Plaintiff was dependent on internal processing rather than underlying activity.

44. Defendant applied undefined and shifting standards in evaluating Plaintiff's account activity, including an undisclosed internal threshold related to claim activity. This threshold was never communicated to Plaintiff, was not reflected in any identified policy or Code of Conduct provision, and was not tied to any specific underlying conduct constituting a violation. Defendant asserted that it followed its standard procedures, yet later acknowledged that misinformation had been provided regarding the handling and interpretation of claim data. The decision-making process therefore relied on internal metrics and interpretations that were neither disclosed nor consistently applied.

45. Defendant accused Plaintiff of fraud, yet did not identify any specific fraudulent transaction, did not establish any intent to defraud, and did not identify any resulting financial loss. A Code of Conduct violation requires a clearly defined policy, identifiable conduct, and supporting documentation tied to specific underlying transactions, not aggregated claim counts derived from duplicative entries. A merchant's refund policy does not define or limit a consumer's right to dispute a transaction. Defendant's shifting explanations, use of internally generated claim counts, application of undisclosed standards, substitution of a vendor-specific policy, and use of Plaintiff's non-public personal information ("NPPI") reflect a process not grounded in objective findings.

9

Instead, this process resulted in the post hoc labeling of personal consumer activity as misconduct.

G. Reputational Harm

46. Defendant labeled Plaintiff's conduct as "fraud" and "abuse of the claims process for financial gain" and communicated that determination to the New York State Department of Labor in connection with unemployment benefit determinations.

47. Defendant's accusation of fraud caused damage to Plaintiff's professional reputation. Plaintiff did not receive notice of her unemployment hearing until approximately six months after her termination, delaying her ability to learn of and respond to Defendant's allegations. As a result of her prolonged unemployment, Plaintiff, a single parent, was required to make an early withdrawal from her 401(k).

48. Defendant communicated these allegations to the New York State Department of Labor in connection with unemployment benefit determinations without identifying any specific fraudulent transaction, intent to defraud, or resulting financial loss. Defendant did not appear at the unemployment hearing to support its allegation of "fraud in personal accounts for financial gain" or defend its internal "taxonomy classification." As a result, Plaintiff's prolonged unemployment has impacted her professional standing and ability to secure comparable employment in the financial services industry.

H. Pattern of Disparate Treatment

49. At the time of her termination, Plaintiff was the oldest and only remaining person of color on her team.

50. Defendant subjected Plaintiff to unequal scrutiny based on her status as an employee who also maintained a personal consumer banking relationship with Defendant. Defendant used Plaintiff's personal account activity in connection with an employment

investigation. The record does not reflect that employees who did not maintain consumer accounts with Defendant were subjected to comparable review or scrutiny.

51. Defendant selectively scrutinized Plaintiff by reviewing her personal banking activity dating back to 2017—before she was an employee—and relying on the length of her account history to label her an "aggressive Claims filer." This approach evaluates account tenure rather than specific conduct and disproportionately burdens individuals with longer-standing accounts, supporting an inference of age-based disparate treatment.

52. Defendant referenced Code of Conduct Sections 1.3 (Personal Integrity & Ethical Decision-Making) and 2.1.5 (Your Personal Finances / Avoiding Conflicts of Interest) but did not identify any specific conduct by Plaintiff that violated those provisions, and instead relied on the assertion that Plaintiff was "unable to provide supporting documentation," without specifying the types of documentation required or providing a secure method for transmission, reflecting both a lack of defined standards and irregularities in the investigative process.

53. The record reflects that (a) Defendant did not identify a clear misconduct standard and relied on retrospective treatment of resolved activity, (b) Defendant proceeded through an investigation marked by procedural irregularities, including the absence of defined documentation requirements and a secure method for transmission, and (c) Defendant subjected Plaintiff to unequal scrutiny and selectively relied on her personal account history. These circumstances support an inference that Defendant's stated reason for Plaintiff's termination was not the true reason and was pretextual.

54. These circumstances are consistent with broader concerns identified by federal policymakers regarding "de-risking" practices in the financial services industry. On February 22, 2024, U.S. Senator Elizabeth Warren and other lawmakers raised concerns to major banks, including JPMorgan Chase, regarding account closures conducted

11

without clear explanation or meaningful recourse, as well as the use of aggregated risk indicators rather than individualized conduct—practices identified as disproportionately affecting minority communities. Legislative efforts, including New York Senate Bills S4603A and S9757 and Assembly Bill A5031, reflect a consistent and ongoing concern regarding the use of consumer financial information in employment decision-making. Subsequent legislative developments, including New York Senate Bill S03072, further reflect growing recognition that such practices are improper and prone to discriminatory outcomes, reinforcing the unreasonableness of Defendant's conduct as alleged herein.

## VI. COUNT I – DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

55. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

56. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., prohibits employers from discriminating against employees on the basis of race.

57. Plaintiff is a member of a protected class based on her race.

58. Plaintiff was qualified for her position and performed her duties satisfactorily.

59. Defendant subjected Plaintiff to an adverse employment action by terminating her employment on or about July 9, 2024.

60. Defendant had access to Plaintiff's personal banking records. Those records reflected Plaintiff's transaction history, including merchant identifiers, geographic descriptors, the duration of her banking relationship, and purchases from culturally specific vendors, from which her age and race were known or readily ascertainable. After Plaintiff was identified as an employee who challenged the number of claim forms submitted by customer service in rapid succession, Defendant escalated an ethics violation using inaccurate, flawed, and unreliable data. In doing so, Defendant subjected Plaintiff's non-

12

public personal information ("NPPI") and consumer activity to targeted scrutiny and selective enforcement, culminating in her termination.

61. Plaintiff's consumer activity consisted of ordinary household, family, and wellness-related transactions, including telehealth services used to support her daughter's wellness and back-to-campus needs. Following the COVID-19 pandemic, essential services—including telehealth and retail purchases—remained largely online, requiring card-based payments rather than cash and limiting in-person resolution of billing issues, resulting in increased transaction frequency and consumer disputes, neither of which constituted misconduct.

62. Where Defendant cannot apply its standards uniformly due to unequal access to employee financial information, it must define and communicate objective criteria for Code of Conduct violations. Defendant failed to do so and instead relied on selectively available data. Defendant closed Plaintiff's account using the designation "Closed – does not convey a negative situation," reflecting no adverse or fraud-related finding, yet used Plaintiff's non-public personal banking information in an employment investigation. As a result, Plaintiff was subjected to scrutiny not applied to similarly situated employees, supporting an inference of discrimination.

63. Defendant then expanded its review to include Plaintiff's banking history dating back to 2017—approximately five years of pre-employment data—and used that extended history to retroactively construct a narrative portraying Plaintiff as an "aggressive claims filer," recasting ordinary consumer activity as misconduct after the fact rather than identifying any contemporaneous violation.

64. Rather than conducting an individualized, transaction-level review, Defendant evaluated Plaintiff's account activity in aggregated form, treating consumer transactions as a generalized risk signal without assessing transaction legitimacy, resolution, or loss.

13

65. Defendant then relied on internally generated and inconsistent claim data, including materially different and unreconciled claim-volume figures and duplicate entries, and failed to reconcile Plaintiff's documentation with its internal records, proceeding on an incomplete evidentiary record. Defendant nevertheless terminated Plaintiff for alleged "fraud in personal accounts for financial gain" without identifying a specific fraudulent transaction, evidence of intent, or financial loss.

66. Plaintiff was treated differently than similarly situated employees who were not Defendant account holders. Defendant relied on a vendor's claim that Plaintiff received the merchandise to treat a routine billing dispute as misconduct. For instance, the investigator's initial call concerned a nearly year-old NY & Co. order that had been cancelled and for which the charge had been refunded. Plaintiff's bank statement reflected the refund. However, Defendant's internal claims records reflected that the charge was billed correctly, demonstrating a discrepancy between internal reconciliation and external reporting. Defendant then escalated this unverified and contradictory information through its ethics hotline into an allegation of fraud. Defendant applied heightened scrutiny to Plaintiff's consumer activity without clearly communicated criteria or expectations and imposed discipline based on undisclosed standards and internally inconsistent data. This differential scrutiny is consistent with recognized concerns regarding disparities in the treatment of minority consumers in retail and financial transactions.

67. Financial institutions, including Defendant, have been the subject of congressional scrutiny regarding account restrictions and closures that disproportionately impact minority communities through so-called "de-risking" practices, in which institutions rely on aggregated or categorical risk indicators rather than individualized assessment. In February 2024, U.S. Senator Elizabeth Warren and other lawmakers raised concerns to

14

major banks, including JPMorgan Chase, regarding unexplained account closures, the use of opaque risk-based decision-making, and the disproportionate impact of such practices on minority customers. These concerns mirror the conduct alleged here. Defendant's use of aggregated consumer-banking data, selective scrutiny, and escalation of Plaintiff's account activity is consistent with the patterns identified in that oversight and supports an inference of race-based disparate treatment.

68. Defendant was aware of (a) underlying data inconsistencies and (b) had access to Plaintiff's consumer-banking information, including her transaction history, spending patterns, location data, and transactions with culturally specific vendors, from which Plaintiff's race was known or readily ascertainable; (c) Defendant did not identify any specific fraudulent transaction, evidence of intent, or financial loss; (d) at the time of her termination, Plaintiff was the only remaining person of color on her team; and (e) her duties were assumed by individuals outside her protected class. These circumstances support an inference that Defendant's selective scrutiny and escalation disproportionately targeted Plaintiff on the basis of race. This conclusion is consistent with congressional concerns regarding account closures and opaque, risk-based decision-making affecting minority customers.

69. But for Plaintiff's race, Defendant would not have expanded its review beyond the transactions at issue or relied on unrelated historical data to convert routine consumer activity into grounds for termination. By applying a standard tied to its access to Plaintiff's personal banking data—rather than to uniformly applied employment criteria—Defendant subjected Plaintiff to a level of scrutiny not applied to similarly situated employees, resulting in discriminatory treatment.

70. Such conduct warrants the imposition of punitive damages to deter Defendant and similarly situated institutions from constructing fraud allegations from unverified

15

internal data and using those allegations to impose career-ending consequences in the absence of any identified misconduct.

COUNT II – AGE DISCRIMINATION IN VIOLATION OF THE ADEA

71. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72. The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., prohibits employers from discriminating against employees who are 40 years of age or older.

73. Plaintiff is over the age of 40 and a member of a protected class under the ADEA.

74. Plaintiff was qualified for her position and performed her duties satisfactorily.

75. Defendant subjected Plaintiff to an adverse employment action by terminating her employment on or about July 9, 2024.

76. Plaintiff was the oldest employee on her team, and her duties were assumed by substantially younger employees, giving rise to an inference of age discrimination.

77. Defendant has asserted legitimate, non-discriminatory reasons for Plaintiff's termination.

78. Those reasons are pretextual. Defendant did not identify any specific fraudulent conduct in the transactions at issue. Instead, it expanded its review to include Plaintiff's banking activity dating back to 2017—including years before her employment—and utilized the accumulation of that historical data, rather than transaction-level findings, to construct a narrative of misconduct. By shifting the focus from the transactions at issue to aggregated historical data, Defendant converted the passage of time into a basis for discipline, subjecting Plaintiff to scrutiny based on the length of her account history rather than any defined violation.

79. But for Plaintiff's age, Defendant would not have relied on extended historical data or retrospective evaluation of her activity to justify termination. This conduct supports an

16

inference that facially neutral criteria were applied in a manner that disproportionately affected longer-tenured, and typically older, account holders. As a direct and proximate result of Defendant's age discrimination, Plaintiff has suffered the loss of her employment, harm to her professional reputation, impairment of future employment opportunities, and other economic and non-economic damages.

COUNT III – DEFAMATION

80. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Defendant published false statements characterizing Plaintiff's conduct as involving fraud and abuse of the claims process for financial gain, without identifying any specific fraudulent transaction, evidence of intent, or financial loss.

82. These statements were communicated to third parties, including the New York State Department of Labor in connection with Plaintiff's unemployment benefits proceeding.

83. Defendant's publication of these statements had immediate and real-world consequences. On June 10, 2024, Plaintiff was denied the ability to open a new account at another financial institution, reflecting the dissemination of Defendant's fraud allegations.

84. The New York State Unemployment Insurance Appeal Board conducted a hearing regarding Defendant's allegations. Defendant did not appear to support its claims. The Administrative Law Judge found no evidence identifying any specific fraudulent activity or policy violation, credited Plaintiff's sworn testimony, and determined that hearsay allegations could not prevail against sworn testimony. The Administrative Law Judge concluded that Plaintiff did not engage in misconduct, and Defendant did not subsequently substantiate its allegations.

85. Defendant's statements were false and unsupported by any transaction-level findings, evidence of intent, or identified financial loss. Under New York law, statements that

17

charge a plaintiff with a serious crime or tend to injure the plaintiff in her trade, business, or profession constitute defamation per se. See *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992); *Kesner v. Buhl*, No. 19-CV-11428 (JPO), 2021 WL 248238, at *4 (S.D.N.Y. Jan. 26, 2021).

86. Defendant's statements accusing Plaintiff of fraud impute the commission of a serious crime and therefore constitute defamation per se.

87. Defendant's statements also impugn Plaintiff's integrity in the financial services industry and tend to injure her in her profession, independently constituting defamation per se.

88. Defendant made and continued to publish these statements with actual malice, or at minimum with reckless disregard for their truth or falsity, as evidenced by its failure to identify any specific fraudulent transaction, its reliance on inconsistent and unreconciled data, its shifting explanations, and its inability to substantiate the allegations when given the opportunity to do so.

89. Any common interest privilege does not apply where, as here, the statements were made with malice. See *ExpertConnect, L.L.C. v. Fowler*, No. 19-CV-8824 (JPO), 2020 WL 3890722, at *7 (S.D.N.Y. July 13, 2020).

90. As a direct and proximate result of Defendant's defamation, Plaintiff has suffered severe and lasting harm to her professional reputation, loss of employment opportunities, denial of access to financial services, and emotional distress. Defendant's labeling of Plaintiff as a fraud actor in the financial services industry caused ongoing, foreseeable, and career-altering harm.

COUNT IV – DUAL-CAPACITY MISUSE OF CONSUMER BANKING DATA AND BREACH OF DUTY

91. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

92. Defendant acted in a dual capacity with respect to Plaintiff: as her employer and as her consumer bank.

93. In its capacity as Plaintiff's consumer bank, Defendant had access to Plaintiff's non-public personal banking information, including her transaction and claim history, while having no comparable access to the financial activity of employees who maintained accounts at other institutions, resulting in Plaintiff being subject to scrutiny based on her private financial data in a manner not applied to other employees.

94. On or about June 12, 2024, Defendant transferred Plaintiff's consumer-banking information, including approximately twelve months of claim data, from its consumer-banking function into an employment-related investigation while the underlying consumer review remained in progress.

95. This transfer shifted the matter from a transaction-level consumer review to a credibility-based employment inquiry, without defined standards, documented authorization, or any identified safeguards governing such cross-functional use, including any verification of the underlying transactions.

96. Defendant relied on internally generated data that was not reconciled, verified, or tied to distinct underlying transactions, including duplicative entries reflecting multiple claims for the same activity, in lieu of any transaction-level findings.

97. On or about December 16, 2024, approximately six months after Plaintiff's termination, Defendant acknowledged that the manner in which Plaintiff's claims were entered into its system "did [her] a disservice," and that different data entry would have resulted in a more favourable outcome, demonstrating that Defendant's conclusions were driven by internal data handling rather than the underlying transactions.

98. Defendant did not obtain Plaintiff's input or verify the underlying activity prior to escalation and instead required Plaintiff to substantiate transactions that had already been reviewed and resolved.

99. On June 24, 2024, Defendant closed Plaintiff's account with the designation "Closed – does not convey a negative situation," indicating that no adverse finding was made at the consumer-banking level.

100. Despite this neutral consumer-banking outcome, Defendant recharacterized the same underlying activity as "fraud in personal accounts" in the employment context without identifying any fraudulent transaction, evidence of intent, or financial loss, and without independent verification.

101. Defendant's use of Plaintiff's consumer-banking information for employment discipline, without verification, defined standards, or authorization, constituted an improper use of non-public personal information inconsistent with its consumer-banking function.

102. This dual-capacity use of Plaintiff's personal financial information created a structural conflict between Defendant's roles as a financial institution and employer, resulting in the treatment of routine consumer activity as employment misconduct without a verified factual basis. Defendant controlled both the creation and interpretation of the data used against Plaintiff, allowing it to generate, aggregate, and repurpose consumer-banking information into an employment decision without independent validation.

103. As a direct and proximate result of Defendant's dual-capacity misuse of data, Plaintiff has suffered the loss of her employment, severe and lasting harm to her professional reputation, loss of future employment opportunities, denial of access to financial services, and other substantial economic and non-economic damages.

104. Defendant's recharacterization of Plaintiff's consumer-banking activity as "fraud" formed the basis for subsequent communications to third parties and adverse actions against Plaintiff, amplifying the harm beyond the employment context.

COUNT V – RETALIATION IN VIOLATION OF TITLE VII AND THE ADEA

105. Plaintiff incorporates by reference all preceding paragraphs, including Defendant's misuse of Plaintiff's consumer-banking data and subsequent recharacterization of that data as "fraud," as if fully set forth herein.

106. Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 ("ADEA") prohibit employers from retaliating against employees for engaging in protected activity. Plaintiff engaged in protected activity by exercising her statutory rights under the Electronic Fund Transfer Act and Regulation E (12 C.F.R. Part 1005).

107. On June 8, 2024, Plaintiff was informed that her account had been restricted because eleven claim forms had been submitted in May 2024. Plaintiff provided her user identification to demonstrate that she had not submitted those entries, challenged that representation, and asserted that she had initiated two disputes.

108. On June 10, 2024, after Plaintiff was identified as an employee who challenged the accuracy of those entries, Defendant reported her for an ethics violation, immediately labeled her a suspect, and escalated her to a centralized employment investigation for fraud in personal accounts.

109. Defendant then transferred Plaintiff's personal bank account activities from a consumer-banking review into a Global Security and employment investigation without identifying a specific fraudulent transaction, intent, or financial loss.

110. Defendant subjected Plaintiff to materially adverse actions, including heightened scrutiny, internal escalation, and workplace investigation into her conduct.

111. Defendant terminated Plaintiff's employment on July 9, 2024 for an alleged violation of an unidentified Code of Conduct. Plaintiff received no termination documentation. Plaintiff was directed to retrieve her belongings from her locker. Plaintiff was escorted out of the building.

112. Plaintiff subsequently received a letter dated August 23, 2024, from the New York State Department of Labor denying unemployment benefits based on Defendant's assertion that she had been discharged for fraud in her personal account, stating that Plaintiff "did not provide additional information regarding your discharge" and "knew or should have known that your actions would jeopardize your job."

113. The temporal proximity between Plaintiff's protected activity and Defendant's escalation through Global Security and employment investigation channels, followed by her termination, together with Defendant's reliance on internally generated data that was inconsistent and not tied to any identified fraudulent transaction and its treatment of consumer activity as misconduct, supports the conclusion that Plaintiff's protected activity was a motivating factor in Defendant's actions.

114. Plaintiff's protected activity was the but-for cause of Defendant's adverse actions, including the transfer of her personal bank account activities into a Global Security investigation and the termination of her employment.

115. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered the loss of her employment, denial of unemployment benefits, harm to her professional reputation, impairment of future employment opportunities, and other economic and non-economic damages.

VII.  DAMAGES

116. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer the following damages:

22

a. Lost wages and benefits from the date of termination through the present and continuing into the future;

b. Denial of unemployment benefits and delay in adjudication, including a delay of approximately six months before Plaintiff received notice of her unemployment hearing;

c. Severe and lasting harm to Plaintiff's professional reputation, including the imputation of fraud and dishonesty in the financial services industry;

d. Loss of employment opportunities and impairment of Plaintiff's ability to secure comparable employment;

e. Denial of access to financial services, including the inability to open accounts at other financial institutions;

f. Out-of-pocket financial losses, including Plaintiff's inability to borrow against her 401(k) plan due to Defendant's fraud-related designation of her termination, which required her to withdraw retirement funds early and incur associated taxes and penalties;

g. Emotional distress, mental anguish, humiliation, and damage to Plaintiff's personal dignity and professional standing within her field;

h. Loss of enjoyment of life;

i. Punitive damages in an amount sufficient to punish Defendant's willful, reckless, and malicious conduct and to deter Defendant and similarly situated financial institutions from engaging in similar misconduct; and

j. Such other relief as the Court may deem just and proper.

## VIII. JURY DEMAND

117. Plaintiff hereby demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendant;

b. Award Plaintiff compensatory damages, including back pay, front pay, lost benefits, emotional distress damages, reputational damages, and damages for denial of access to financial services, and other consequential damages;

c. Award Plaintiff punitive damages in an amount sufficient to punish Defendant's willful, reckless, and malicious conduct and to deter Defendant and similarly situated financial institutions from engaging in similar misconduct;

d. Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and other applicable law;

e. Award pre-judgment and post-judgment interest as permitted by law;

f. Award equitable relief, including reinstatement or, in the alternative, front pay in lieu of reinstatement;

g. Grant such other and further relief as the Court deems just and proper.

Dated: _May 7, 2026_

Respectfully submitted,

_Moya Morgan_

Moya Morgan, Plaintiff Pro Se

1270 East 51st Street, Apt. 5M

Brooklyn, NY 11203

(917) 651-7949

moya_morgan@yahoo.com


VERIFICATION

24

STATE OF NEW YORK    )

                     ) ss.:

COUNTY OF KINGS      )

I, Moya Morgan, being duly sworn, depose and say:

I am the Plaintiff in the within action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____
Moya Morgan

Sworn to before me this

7ᵗʰ day of MAY_____, 2026

_____
Notary Public

JOHN MOUSSA
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in Kings County
01MO6380715
☆
MY COMMISSION EXPIRES 11/16/2026

25



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/09/2026

**To:** Mr. Moya J. Morgan Esq.
43 West 43 Street Suite 277 Suite 277
NEW YORK, NY 10036
Charge No: 520-2025-05268

EEOC Representative and email:    SILVIA DENG-BATISTA
INVESTIGATOR
SILVIA.DENG-BATISTA@EEOC.GOV

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2025-05268.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
02/09/2026

Arlean Nieto
Acting District Director